Case of David Coffey and Maureen Coffey v. Casino Queen. We have Colleen Jones for the appellant and Chris Math for the athlete. So, yeah, we're missing both of them. Let's go to the second case. Well, we can. We have Kevin and we have Paige. Paige is here. No, where is Paige? Paige is not here. Okay. Well, I guess the other people might be out there, too, so we might just wait and see if they appear. Okay. Okay. We've already announced the case, so Ms. Jones, you may proceed when you're prepared to. Good morning, Your Honors. May it please the Court. Good morning. Your Honors, this case arises from a case that was tried before the circuit court in St. Clair County. And the issue before the court today is whether or not the plaintiff received a fair trial. Just a little bit of background. Mr. Coffey was injured when he went to the Casino Queen on New Year's Eve, one of those packages where you spend the night and you get to go to the band and that sort of thing. He fell in the men's room on some water, striking the back of his head hard on a tile floor. And he's been permanently disabled since the accident. He had a significant close head injury. This was a six-day trial, resulted in a defendant's verdict. Two issues arose during the trial, which I think made it impossible for the plaintiff to have received a fair trial, and which were highly prejudicial to him. The first was some evidence that came in through an expert hired by the defense, a Dr. Katz, who essentially did two things that were very prejudicial to the plaintiff. First, he violated a motion in Lemonade in which all parties were instructed not to mention the issue of Social Security. And he did mention Social Security to the jury when he was being cross-examined and indicated that he had seen some medical records that were in the Social Security file. He was instructed by the judge to move on, and then he did move on. And when being questioned further on what evidence he had, the big issue in this case was whether or not the plaintiff was disabled prior to this fall, whether he had any kind of head injury before the fall that would have given him the degree of injuries that he had after the fall. He had a psychological injury, essentially. His doctors believed that the strike to the back of his head caused him to develop a bipolar depression condition. And he also had some cognitive problems, but the big issue was the bipolar. And so Dr. Katz also being cross-examined about whether or not that he had any evidence other than two records from his treating physician within the months prior to the accident. There were these two records, which he went to his doctor and said, I'm feeling a little stressed and having trouble sleeping at night. But other than that, Dr. Katz was asked, do you have anything else on which to base your opinion that you're giving the jury that this man has had this condition his entire life? And he said, well, not anything I'm allowed to tell the jury. And he turned and looked right at him when he said that. And the judge stopped him, and he instructed the jury to disregard his remarks. But it was so prejudicial to the plaintiff. And the reason is because when you have a head injury like this and when you have a psychological injury, I don't have any x-rays I can show to the jury to show the break in the leg or the mangled bones or anything like this. So you have to really win over the credibility of the jury with an injury like this. And the way you do that is through the plaintiff and that he was a credible man and that he was not lying to the jury, that he had a lifetime history of not having this problem before. He'd been married for 25 years. He'd worked with the same employer, worked in a factory for 30 years as an exemplary employee. His employers came in and testified on his behalf that he was their go-to guy before this accident and afterwards unable to do the job ever again. His wife testified what he was like before and after, and his children also testified. Let me ask you a question about the mention of Social Security and the other medical issues. Was there a motion for mistrial made? There was not a motion for mistrial made. There was a motion to strike the testimony, the entire testimony of Dr. Katz, and that's what the appeal is about is that whether or not the trial court heard in not striking the entire testimony of Dr. Katz. And what the judge decided to do was to strike those portions of the testimony and to strike all of his psychiatric-type testimony. He had other testimony about whether or not the man could work and his life care issues. But his entire testimony was not stricken, which gave credence to all of his testimony. It's very difficult once the words are out of your mouth to take something back when you're in front of a jury, especially in a case which is kind of highly charged like this about whether someone's telling the truth or not. And the jury's watching everything, trying to figure out who's telling the truth and who isn't. And then a comment like this comes into the case, and it just skews everything in an unfair and a wrong direction because it's not based on any evidence that they were supposed to be hearing. In fact, it wasn't based on any evidence at all. He didn't have that sort of testimony to present. And I'm sure no one knows why he said that, but he did say it. He's an expert that testifies 48 times a year, either in deposition or in court. He's been doing it for many, many years. He received $7,000 for testifying in this case, and you do better than to do that. This wasn't, you know, a rookie doctor on his first try who doesn't know what the rules are. I thought there was a lot made about causation. I'm sorry? There was a lot of discussion about causation. There was discussion about causation. It was another issue, another reason why the credibility was so important. And the issue, the second issue that I'm going to talk about has to do with the spoiliation of evidence, which goes directly to the causation issue. And the cumulative effect of not being able to believe the plaintiff on his personal injuries and then questioning the causation because the evidence of the videotape has been destroyed and we're no longer able to prove what witnesses there might have been, whether or not the casino queen's story of who was in and out of there, checking on the cleanliness of the bathroom, was true or not. In particular, there was a witness who didn't learn about the accident until a couple of months before trial, and even though that was five years after the accident, was able to testify, did testify to the jury that he remembered going in there ten times that night to clean the bathroom. That's just not credible. And a videotape would have been able to show that, no, they weren't in there every ten minutes as they said they were. Now, the videotape that you're wanting is something that's pointed to the entrance or an exit of the bathroom? That's correct. Because it's a bathroom and privacy issues, obviously there's no videotape in the bathroom. And was there any agreement that such a video did exist? The defendant didn't dispute it. However, I took the deposition and there was testimony at trial of a witness who was a former employee, director of marketing for the casino queen. He happened to be standing right outside the bathroom door when the plaintiff came out. He testified that he was holding his head, his clothes were wet, and he said, And this man, Garrett Sizick, immediately called security and called surveillance, told them that there was an accident, told surveillance to look for it, he looked for it on the tape, and then he went in to the restroom, found a two-by-two-foot puddle of water on the floor, which he said appeared to have leaked out of one of the toilets of the urinals, and then spoke with surveillance afterwards, and surveillance said, yeah, we have a tape of you talking to Mr. Coffee, you know, right when he came out the door of the bathroom. So that tape, presumably that camera was craned right in that spot, would have shown who was walking in and out of the men's room through the course of the evening, whether or not it was being cleaned as was required, and whether or not any other witnesses, who might have been available to help Mr. Coffee and tell him, look, I saw water on the floor, too. Who testified that there was no leak in the urinal or anything? I thought there was some evidence of that. There was no concrete evidence that there was no leak in the urinal. Plumbers or something like that? There were no plumbers. There were only employees at the casino. And this former employee said that in his best judgment, that's what it looked like to him, that it had leaked out of one of the urinals or perhaps the toilet. But there was no concrete evidence that that hadn't been the case.  Which kind of set up the whole picture for the plaintiff of a trial that just didn't end up being fair to him. A motion was made to strike the entire testimony of Dr. Katz, based upon these two rather egregious things that he did, where he revealed evidence, improper evidence to the jury that he knew better than to do. There's a case, Ben Juarez v. Bacos. It's from the Hearst District. It states that failing to strike improper evidence on a motion duly made is a reversible error, where such evidence may have influenced the results. I think there's no question that the testimony of Dr. Katz influenced the results. It greatly damaged the plaintiff's credibility, and it brought into the forefront of the minds of the jury the idea that either he was already receiving Social Security, so why does he need something more, or Social Security probably already turned him down, and so we should, too, if they didn't find anything we shouldn't either. And those are the only two ideas that a jury can possibly have when they hear the word Social Security, and that's why we have such a strong collateral source rule about letting that in. That's why the judge, and it was agreed to, of course, by the defense, that that matter would not be gone into during the trial of the matter. That was agreed to a motion to eliminate. Let's jump back to the surveillance issue. Yes. The one person who presumably would know about any tape was the director of security, Ed Musi, and he said he was unaware of any such tape. So how do you get beyond that? He said he was unaware of one. However, in cross-examination, he was not the director of security. He was the director of security at the time of the trial. He was also the manager of the casino, but he said he was unaware of one. There are two different departments. There's a security department and a surveillance department. It was the surveillance department that told Garrett and Isaac that there was a videotape. Did anyone attempt to depose anybody from the surveillance department? No. And that resulted from some confusion on my part that that was the same department. It was only in the trial that I realized it was security and surveillance were separate issues. So don't you have to prove to some reasonable degree that something exists before you can say there's spoilation in destroying it? And I think that we did. And the way that we did that is by cross-examining Mr. Musi about the existence of the videotape. Basically, what we were told is there are videotapes looking at just about every aspect of this casino all the time. They're on all the time. We know that a videotape existed because one of their own employees, the director of marketing, stated that he spoke to surveillance and that they told him there was one. And then Ed Musi was confronted with, when the copies tried to report their accident that night, they told Garrett and Isaac and no one from security ever came to see them. So the next morning they went back downstairs and told security about it. And the minute security became aware of them, it trained a camera on them from that moment on until they walked out of the casino by a rather circuitous route. As they went down each and every hall, down each flight of steps, and out to the parking lot, they were tracked by this videotape. And when confronted with that, Ed Musi said that I believe there would have been a videotape. If there was a videotape trained on the door, it would have shown who was coming in and out of there. It would have shown whether or not people were going in and out of it to clean. And although he said he was unaware of the existence of one, it wasn't the kind of answer where he was certain that there wasn't. And we had testimony from Garrett's Isaac, a former employee, that there indeed very well was one. Why was it a motion to add expoliation pursued? You know, that was a judgment call on my part in the middle of a trial. I'm not a perfect attorney, and in hindsight, now that the results, I'm wishing I'd done that. But I had a lot of issues going on in that trial. It lasted six days, and I just didn't do it. The other thing I have, there's just kind of something passing about a brother-in-law statement. I would imagine that's pretty damaging. Well, not really. No? Okay. And the way that it's not really damaging, it's an ex-brother-in-law, a lot of bad blood. But I don't even think that... Well, I kind of figured there might be some other issues in there. Yeah. But the real thing that he said, if you read it in the transcript carefully, he said for the defense that I walked in the bathroom, I didn't see any water on the floor. And I was in there. And as I went out the door, I passed the plaintiff going in. So if there wasn't water on the floor when I was leaving, in essence, what he's saying is there wasn't water. But didn't he also say if there had been water, I would have seen it? He did. But then when cross-examined, he said, I walked straight into the center urinal. I did not look to my left. I did not look to my right. I did not look on the floor to my left or right. The water would have been on the floor to his left. And he said he didn't look. He didn't pay any attention. He didn't notice. So basically what he's testifying to is there was a clear shot with no water to the center. But that's not the area that we're talking about. We're talking about the area to the left, which he said, I can't say as I sit here whether there was water there or not because I never looked at that area. So I don't think that that testimony was damaging to the plaintiff. I think what it proved is he was willing to come in and testify against him. But when he got there, he wasn't really willing to lie and say he looked all over the whole floor. He did say, I only looked in the center, and there wasn't any there. But that wasn't the area over here at Syzic and where the plaintiff said the water was. And notwithstanding that there was no affiliation cause of action pursued, the court did give 5.01. They did. They did. And the trouble with this case, Your Honor, is if it were just that issue, I think that the court would have probably done what they could do. But it's the cumulative effect of damaging evidence that had already come in from Dr. Katz, which had already so damaged the plaintiff's credibility. And now you compound that with not being able to regain that credibility by putting on this videotape that shows who was in and out of that bathroom, that shows whether the casino queen was being credible about whether they were cleaning, which shows whether their witness, the ex-brother-in-law, was being credible. It's not that issue alone, but it's the cumulative effect of the two of them together. I realize that this, of course, is within the discretion of the trial judge, both of these issues. But the discretion of the trial judge is to be exercised as best answers to the ends of justice. And there are numerous cases that say that. There's the Ashton-Sweeney case in the Second District. And I guess that's what I'm getting to is the cumulative effect of what happened in that trial resulted in the plaintiff not receiving a fair trial, resulted in justice not being done to him. If neither of these things had happened and there had been a defense verdict, we wouldn't be here talking to you today. But the evidence that came in from Dr. Katz was so damaging to his credibility. He's a difficult man to deal with as a client. Because he has a head injury, he doesn't engage with the jury. He doesn't look at them. He doesn't make eye contact. He can't sit up and say, here's how I was before and here's how I am after. He kind of stutters and mumbles. And the evidence had to come in from the people around him. And so when you have this doctor come in and say, oh, no, no, he's been injured all his life. He's had all these other problems. He's always been like this. You try to overcome it with his employers, his family, everybody who's known him his whole life. Was there bruising, swelling? He had a bump on the back of his head. But it wasn't a significant exterior, like a lot of closed-head injuries. The problem with his case was there was nothing there, even bleed. He didn't have a great big bump on the back of his head for a long time. It was a concrete or a tile. It was a ceramic tile. It was a hard floor. It was a difficult injury. I acknowledge that. I had medical testimony from two doctors, one a psychiatrist and one a neurologist, who said that they believed that the accident had caused his injuries. I guess that's injuries, but his psychiatric condition that he had after the accident. Was there any evidence of soiled clothing? His clothing was wet when he came out of the restroom, according to Garrett Sysak. He also testified that his clothing was wet, but an independent witness testified to that as well. So I think at trial the issue kept kind of rearing its head as to whether or not the accident had happened at all. But with Garrett Sysak saying he walked straight out, walked right up to me, holding his head, said he fell, had wet clothes, I felt like we had that issue under control. The issue that was more concerning was, of course, the medical issue, and that's the one that Dr. Katz went right to the heart of when he was talking about all these prior problems and issues that he had prior to the accident, which was news to his family and his employer. But you're saying, then, that that spilled over, Dr. Katz's innuendo spilled over, and also then indirectly caused the not guilty verdict based on approximate cause as well, on causation even. I think so, Your Honor. I think that what we had here was just sort of a perfect storm of, you know, you have Dr. Katz come in and totally malign his credibility, and then on top of that, you know, if we've been able to then, with the videotape, put in a much stronger case on causation, you know, a lot of times you can carry yourself one way or the other if the jury's wondering about credibility on the injuries, you have causation. If they're wondering about credibility and causation, you have the injuries. But because of what happened here, in both cases, orchestrated by the defense, either, you know, I'm not saying intentionally, but through the testimony of Dr. Katz and through the spoliation of the evidence, you know, he was fighting just such an uphill battle, and I think the comments of the trial court in all of our motions discussing these issues throughout the trial are very telling about, you know, he certainly believed there had been a videotape, that it was very prejudicial to the plaintiff, that it had been destroyed. He certainly believed that Dr. Katz was way out of line with his comments. But I think he didn't go quite far enough in striking the full testimony of Dr. Katz and in allowing the plaintiff to a new trial on the issue of the spoliation. There are a couple of cases I wanted to highlight to the Court on the issue of discretion to be exercised by the trial court in reviewing a motion for a new trial. In the, I'm not sure how to say it, but Pankinto v. Morrison Hotel case, it's a 1st District case from 1966, the Court stated that the discretion to be exercised by the trial court is not unlimited and should be controlled by reason. Where the verdict could have been influenced by incompetent and erroneously admitted evidence, and where the verdict could have been the result of passion or prejudice, reasonable discretion imposes a duty upon the trial judge to grant a new trial. And I think that this case fits very squarely within that principle of law. The verdict very well could have been influenced by this incompetent evidence and this erroneously admitted evidence of Dr. Katz, and it very well could have caused the jury to become prejudiced against the plaintiff and therefore did not receive a fair trial. But the McDonald case also says that when an in limine order is cured by the circuit court, that is not an abuse of discretion. I understand, and I know there's cases that go back and forth on these issues. And again, this comes back to my concern about the cumulative effect of both problems coming up at once. So we have a motion in limine. In and of itself, that might not have been as bad. But then in addition to that, we have an improper comment to the jury about, I know things that I'm not allowed to tell you, and boy, I wish I could tell you was the implication, because then you'd really think this guy was lying. And then you have this correlation of evidence. So it just kept accumulating to a point where the plaintiff really couldn't overcome the prejudice of it. And so each of these things I understand that are cases standing on their own might not be as big of a problem. But taken together as a whole, it resulted in an unfair result to the plaintiff, an unfair trial. There's another case I want to point out to the court, the test for whether the trial court abused its discretion in denying post-judgment motions versus whether the refusal violates the moving party's right to fundamental justice and manifests an improper application of discretion. And that's the industrial steel case. It's also from the First District in 1994. So there are plenty of cases out there pointing to the effect that, you know, if the plaintiff has not received a new trial because of something that's gone wrong, because of some prejudice, some improper evidence that's gotten into the trial, that he certainly deserves a new trial, and that certainly within this court's power to find that the trial court abused its discretion by not granting a new trial where there's then a violation of his right to a fair trial, a violation of justice. Thank you, Ms. Jones. You'll have the opportunity for rebuttal. Thank you. Ms. Mann. Thank you. Please, the court. Good morning. My name is Chris Mack, and I represent the Casino Claim, and I'm the trial attorney on this case. One thing I'd just like to point out is the plaintiff has the burden here to prove abuse of discretion. In other words, the Judge Guido's actions of denying the motion of new trial constitute abuse of discretion. So they have the burden of proving, which I'm sure you're fully aware, that the evidence was unsupported of the verdict in this case. And I'm not going to start out with that, but I'll explain why that's not the case. They also, or they've been in the alternative, which I think what they're claiming here is that they received an unfair trial. Let me start off, if you will, with Dr. Katz. Dr. Katz mentioned one time the word social security, and I'd like to point out to the court that that wasn't during my questioning. I did not elicit that testimony from him. That was during plaintiff's questioning of Dr. Katz. The question was asked something to the effect, where did you get these records, or where did these records come from? And he mentioned social security. On one occasion, he did not reference the word disability, and this was during a five- or six-day, actually, long, lengthy trial, as counsel pointed out, and he did not provide any details concerning social security. But I would also like to point out that another physician we called to trial, Dr. Garcia, a psychiatrist, he was asked questions about short-term disability claims. In fact, he testified, and this was not objected, plaintiff did not object to this. There was no motion in limine, and it all just went in. He was asked questions about prior short-term disability claims and testified there were 11 prior short-term disability claims. They were over a course of many years, but that was talked about in great length with Dr. Garcia. So this, if anything, Dr. Katz said about social security somehow implied a disability. This had already been referenced. Well, actually, Dr. Garcia's testimony was at Katz, so it wasn't already referenced. It was referenced later that Dr. Garcia was one of the last witnesses who took the stand. And he was asked a whole line of questioning about these prior disability claims. In fact, one of his basis for his final diagnosis of somatoform disorder and depression that was preexisting related to these prior short-term disability claims, and three or four of which related to brain injury, getting his head hit. So to any extent that Dr. Katz's testimony mentioning social security on one occasion somehow suggested a social security claim, that's cumulative because Dr. Garcia, my psych expert, testified at length about 11 prior short-term disability claims. But the reason why Dr. Katz's testimony does not constitute extreme prejudice is because of this. The judge heard it. They asked for a couple things. One of the things they asked for is that it be stricken. It wasn't all stricken, just the psych portion was stricken. But Judge Guido appropriately struck that entire part of Dr. Katz's testimony. Furthermore, there was an instruction to the jury that the jury was not to consider the possibility of any other sources of benefits, either at the present time or in the future. So they were also given that instruction. There's a whole line of Illinois cases, including Nickton, Crumpton, and McDonald, which state, and Nickton was about a witness mentioning a prior slip and fall, which was in violation of an eliminating order like we have here, and the judge cured it by saying, jury, please don't consider that. Disregard that testimony. And in Nickton, the court said that was sufficient. That cured the problem. And then we go on to Crumpton, where there was testimony, even very strange testimony, about the plaintiff hearing voices, which appeared to be very dampening. It related to the judge had ordered that there not be a mention of any psych injuries or any mental injuries, and there was testimony by a doctor that the plaintiff heard voices. Now, how did that come out? There was a doctor on the stand. Who's doctor? It was the plaintiff's doctor, and the defense was asking the questions. That he was hearing voices prior to the fall. Yes, the plaintiff was, sure. And the judge had previously entered an eliminating order, and that was violated, and the court in that case said a new trial was not in order, that the court had cured the problem by telling the jury to disregard that testimony. So is it your opinion that it's always cured? No, it isn't always. By telling the jury to disregard? No, it isn't always cured. If there was a situation... You always have to look beyond that, though. Sure, certainly, and if this case was one where Dr. Katz said, this man was receiving Social Security benefits for a disability, and here's what it related to, and he provided all these facts, and he suggested more than one reference, when the plaintiff was asking him about Social Security, it would be a different fact scenario. But looking at our case, it was mentioned on one occasion, and that was the only word said. But Dr. Katz did other things that offended the judge quite dramatically. He did the one other thing, and that was that he said... He looked at the jury and told them, I'm not allowed to testify about certain things. Yes, and I don't agree with that statement. I don't think he should have said that. I'm not going to stand here and tell you that was appropriate. It wasn't appropriate. It definitely wasn't appropriate. But again, the judge cured these problems by doing three things. He told the jury to disregard it. He struck Dr. Katz's testimony regarding psychiatric, any of his testimony about psychiatric injuries. And thirdly, he gave them the actual jury instruction to not consider. You're not allowed to speculate as to any other support that the plaintiff may or could have received in the future. So he fixed that problem. And basically, the McDonald case is the other one I want to mention, which is an Illinois Supreme Court case that involved, again, a violation of a motion in limine. And that case involved not a motion for a new trial, but a motion for a mistrial. And again, the court said in that case where they referenced a prior trial. And it was a doctor, again, who accidentally said something about a prior trial when he shouldn't have. There was a motion in limine in effect. And again, the Supreme Court said it was fixed and cured by the judge, the trial judge, telling the jury to not consider. Is it your position that Dr. Katz accidentally said those statements, that that's all I'm allowed to testify to? Well, that wouldn't require me to speculate. Really? That seems to be a stretch. I don't know what his, you know, I can tell you I certainly didn't tell him to say anything like that. Nobody's implied that. And I certainly wasn't happy with that by any means. And I will tell you the judge certainly gave him a lot of talk off the record or even on the record outside of the jury. And that was, he should have been told a lot of things outside of the jury's presence, and he was. But so their position in this case is that Dr. Katz, one reference to Social Security, and his reference to, as you just mentioned, Your Honor, that he wasn't allowed to talk about other things, is that that caused them to have a, that they were prejudiced and they sustained extreme prejudice. I submit to you, Your Honors, that that had nothing to do with the elements of the claim in this case. The elements of the claim are, it's a slip and fall case where he allegedly fell off the liquid. And the issue there is, did we cause the liquid? You're all familiar with this. Did we cause it? Did we know about it? Was it there for the length of time that we should have known about it? Nothing to do with Katz. Katz had nothing to do with that. And for plaintiff's counsel to suggest that there was no evidence about the plaintiff's injury being preexisting or that his injury was not caused by this accident is simply not the case. I had Dr. Garcia, who's from Lawrence Hospital, who's a Washington physician, who's never testified in trial. He's done a work comp thing before, but he's not a professional witness. And he said, I spent hours with the plaintiff. I looked at all of his prior records, and they show that he had preexisting depression. And they show he had another condition that's called somatoform disorder, which I'll tell you I'm not an expert in. But basically it's a condition where a patient thinks that he has all these things wrong with him or she does, and the objective test, physical exam, will test and show that they don't. And there's a repetitive thing about that, and that's what he believed the plaintiff had here. So Dr. Garcia testified about that at length, and so what Dr. Katz said, you know, pertaining to the psychiatric injuries and or any other injuries really didn't matter because Garcia talked about these at length. So anyway, that's the first issue. But the second issue the plaintiff's relying on here to say that they should have obtained a new trial was the spoilation of evidence issue, the surveillance tape. And Your Honor pointed out, was there concrete evidence of a tape? That's a good point. I submit to you there was conflicting evidence. You had Garrett Sizing say, the director of surveillance told me they caught me talking. They had me on tape talking with the plaintiff. First of all, there's a couple problems here. We don't know that they were standing right in front of the door. First, why would you stand right in front of the door? The door would probably hit you. There's no evidence they were standing right in front of the door, and that tape was on the door prior to the incident. All we know is one statement Sizing was told. That's what he testified to and linked it, you know, directly. What we also have, which is conflicting, is Ed Muzzy, the director of security, who testified twice during, I believe it was, direct examination. No, it was her cross. He said, I'm not aware of any tape. I'm not aware of any tape existing. I'm unaware of this. He said, if the camera was trained, if it was focused on that door prior to the incident, then we would see people walking in and out, which is really the time curve we're talking about. What nobody said was that this would show whether or not there was water in the restroom, because there's no way it would show that it wasn't in the restroom. And their burden of proof in a premise liability case is to show either we caused the water, either we knew about it, or it was there for sufficient reason. And I guess there's no real conflict about what the plaintiff told Mr. Sizing and also whether or not he was wet. So that would be disproved by surveillance tape. No, we did not dispute that. No, we did not. You're correct, Your Honor. We did not dispute that. But the surveillance tape, not only was there conflicting evidence as to whether or not it actually existed, but as one of you pointed out, there's two options the plaintiff had. The plaintiff was offered by the judge, and Gilbert County, I think, was discussing with the judge on the record. They had the right, and he was going to give them every opportunity to pursue a spoilation claim. And as you're all aware, Boyd v. I'm going to say Allstate every time it's Travis. But anyway, Boyd v. Travis, Seminole Case in Illinois, which talks about and discusses at length that you can have confirmed crimes. The judge said, Do you want to amend your complaint? Or, the alternative, do you want an adverse evidence description? And the plaintiff chose to go the route of the adverse evidence description. When you have the opportunity of remedies, situations, and you pick one over the other, you can't come back here and ask the court to enforce a Rule 219 sanction for discovery violations. That rule is applicable to trial courts, to trial judges, when there's a violation of the discovery rules or there's a violation of a court order. And I submit to you that's completely misplaced here. They've cited no case where an appellate court was asked to determine that summarily, that spoilation of evidence actually occurred, and that's what they're asking you to do, to determine that we committed spoilation of evidence and then just to have a trial on damages. They've already had the opportunity to pursue a spoilation claim. They, when Garrett's Isaac testified more than a year before trial, and they had previously asked us in written discovery for that tape, and we said we don't have it, we don't have a tape like that, period. And they were told that more than a year before trial. They were told that during Isaac's discovery deposition when he said, I think there was, they could have right then said, okay, we're going after a spoilation claim. But they chose not to. Then they had the opportunity during trial. So they chose to pick the adverse evidence description, which you're all familiar with, 5.01. And the 5.01 tells the jury to infer that the evidence would have been adverse to me. And guess what? They argued that to the hilt. That was argued to the hilt during the closing argument that, hey, we had a tape, and it was adverse, and it would have shown all these things, and all our people are not telling the truth about going into that restroom. The one thing that we know, they're basing a lot of their argument on Isaac with regard to liability. He said in a row, hey, I presume that water came from the boiler or the urinal or whatever he said about that. I presumed it. Well, you can't say Isaac is good on one part of it, but Isaac is not good on the other part of his testimony. He said I was in that restroom a half hour before this complaint of the plaintiff was given to me, and there was nothing on the floor. You can't have it both ways. So we have him testifying. There was no water on the floor. And he was in there a half hour before. We have a law book showing and an entry there showing 40 or 50 minutes before there was fine and clear. And then we have management talking about that. So you can't have it both ways in talking about Isaac and whether he's credible or not. Either he is or he isn't. But the issues in this case really point to liability. The liability was in here. They didn't have the evidence to show how the water got there. The plaintiff said I don't know how the water got there. He said I don't even know it's water. I don't know what substance it was. I don't know how it got there. I don't know how long it was there. I don't know what size it was. I have no idea. And there was no witness to the accident, so nobody else can testify to that. And so the liability, the jury decided on liability. They didn't decide, hey, we think cats, you know, we think there was some disability here, so we're not going to give him as much money. You don't have a situation where there's a compromise verdict. You have a clear-cut defense verdict on liability. All I have to do. Thank you, Ms. Mayer. Ms. Jones, do you have rebuttal? With regard to the disability claims, what Ms. Mack is referring to are some references to some time off work that Mr. Coffey took. And the way the doctor would describe it was as a short-term disability, which, as most jurors know, is how all employers call sick days now. So there wasn't evidence throughout the trial of all this other prior disability in terms of how we think of that work as it stands on its own in terms of the Social Security. It was just days off. And they were very minor things. I twisted my ankle falling off a ladder yesterday because I didn't work for one day. His employer called that short-term disability, and that was well explained in the trial. So there was no reason to object to that testimony. I just wanted to make that point. The problem with this case is- Excuse me. I'm a little bit confused by that. Sure. You're saying that there was never any claim filed for anything? No. These were just things for his employer. Instead of calling them sick days, they would call them short-term disabilities. And I guess if you take a longer than a certain amount of time, you get a long-term disability. But these were all just what Dr. Garcia found in his appointment file, which we produced, or which they subpoenaed, I can't recall which, were these short-term disabilities. But they were just- He didn't file claims with Social Security for them or Workers' Comp for them or anything like that. There was no evidence like that on the board. It was just sick days, days off work. And this was over a 30-year period. They went back as far as when he started that job at 19 years old. So it was a lengthy period of time that they looked at every single sick day he ever took in 30 years and combed over it with a fine tooth comb. The problem with this case is, as their expert testified and as my experts testified, when you have a head injury like this, there is no objective sign to take an x-ray of. And that's not just true of Mr. Coffey. There's no sign. One doctor gave the example, if you see a bullet in a brain, that's an objective test. But just depression, that doesn't show. Pain doesn't show. Bipolar doesn't show. These aren't things that we have as technology yet to determine with a machine, whether or not someone's telling the truth. So the credibility is a big issue. This testimony about or this comment about Garrett's eyes, it was in there half an hour before. I was trying to have it both ways. As the Court is aware, there are many cases that have held 10 minutes is long enough for a defendant to discover water was on the floor. So the fact that he was in there half an hour before doesn't tell us anything. This brings us right back to the problem of not having a videotape to see whether all these other employees, you said they were in there 10 times or, you know, very frequently throughout the night, whether or not they were in there, could have discovered that there was water on the floor. Your Honor, in conclusion, I would ask the Court to find that the plaintiff has not received a fair trial, that justice was not done in this case as far as plaintiff is concerned. If the case had come in clean without all of these problems, he would have to live with whatever result the jury gave. But it didn't come in clean. And the cumulative effect of all of the problems that we had with Dr. Katz looking right at the jury, yes, that testimony on Social Security was elicited by me. I certainly didn't try to trick him into saying that. I asked him if he had any prior records and he said he had some in the Social Security file. I mean, that was something he was instructed before he walked in the door not to mention. So to imply that I somehow lured him into saying those words so I could have him violate a motion for elimination was ridiculous. The Court in Ashton v. Sweeney, which is a First Circuit case from 1953, spent good law all those years, says with regard to the judicial discretion of the trial court in the granting of new trials, discretion is to be exercised as will best answer the ends of justice. The best answer to the ends of justice in this case is to give Mr. Coffey a shot at a clean trial, a trial without Dr. Katz implying that he's not credible to the jury, and a trial where the issues of the spoliation of evidence can be fully examined by the court and by the jury. And we would ask on behalf of the plaintiff that you amend this case back to the Circuit Court in St. Clair County for a new trial on both of those issues. Thank you, Ms. Jones. When we react, we will take the matter under advisement.